### LAMB v. UTLEY.

1. SALES—CONTRACTS—MODIFICATION—RETENTION OF TITLE.
   The parties to a contract for the sale of goods have an undoubted right to so modify it that the seller shall retain title to the goods until they are paid for.

2. SAME—DELIVERY OF GOODS—CONDITIONS PRECEDENT—PAYMENT OF PRICE.
   In the absence of an express agreement, the law will imply a contract to pay cash upon delivery of goods, and, in such case, payment or tender is a condition precedent to the buyer's right of possession.

3. SAME—RETAKING PROPERTY.
   If the seller delivers the goods and immediately demands payment, which is refused, he may retake them.

4. TROVER AND CONVERSION—CONVERSION BY BUYER—WHAT CONSTITUTES.
   Where a buyer of goods refuses to pay for them on delivery, and refuses to allow the seller to retake them, he is liable in trover, and the seller is not confined to an action for breach of contract.

Error to Lapeer; Smith, J. Submitted November 15, 1906. (Docket No. 11.) Decided December 17, 1906.

Trover by Clayton J. Lamb and Ernest D. Lamb against Daniel T. Utley. There was judgment for plaintiffs, and defendant brings error. Affirmed.

*William E. Brown* and *Geer, Williams & Halpin,* for appellant.

*John Loughnane* and *Stickney & Reed,* for appellees.

HOOKER, J. To prove their cause of action, the plaintiffs introduced evidence tending to show that they, father and son, owned a quantity of baled timothy mixed (with straw) hay; that the defendant offered them $7 per ton for it, plaintiffs to deliver it f. o. b. car at Dryden, a railroad station distant a few miles from their farm; and that they accepted the offer, with the further agreement that they should load the hay upon their own account; and that the possession and title should remain in the plaintiffs until the hay should be paid for. They also offered evidence tending to show that they delivered the hay on the car; that it was sealed by the agent, and defendant directed that it be billed to his agent or to one of his customers, in another town; that one of the plaintiffs and the defendant then figured up the amount of the hay, and the cost of the same at $7 per ton, finding that sum to be $72.50, that plaintiffs then demanded payment, which, being refused, they brought replevin against the railroad company; that suit being discontinued, after the agent, acting under instructions from his superiors, sent the car to its destination, after which this action of trover was brought. Plaintiffs recovered, and defendant took a writ of error.

The defendant's version, sustained by the evidence produced by him, was to the effect that the contract, under which he claims to have received this hay, was made orally on February 16th; that he then bought, and the plaintiffs sold, certain clover hay and certain timothy hay mixed, then present in plaintiff's barn, at $8 per ton; that he was to bale the clover and also the hay after plaintiffs

should have removed enough of the straw to make it conform to a merchantable grade, as was done the fall before on a purchase of some timothy mixed, from the same mow; that the plaintiffs were to draw the hay and load it on a car at Dryden station. Defendant paid $30 down upon it.

This testimony tended to show that he sent his men to bale the hay, that after baling the clover, they started to bale the timothy, plaintiffs professing to grade it according to contract; that after baling a portion, they refused to bale more for the reason that plaintiffs left too much straw with the hay, when plaintiffs said:

· "Well, you go on and bale it, and I will make it right with Utley."

They then baled the remainder and, upon the next meeting of the parties, the adjustment of the price to be paid for the timothy was attempted, but they did not agree. Several other attempts were made, and, while defendant demanded the delivery of the clover, he refused to take the timothy in its ungraded condition, unless they would agree upon a price, and plaintiffs refused to draw the clover, unless they could agree upon a price for the timothy, although demanding that defendant take it all at a discount of $10 from the aggregate price, such demand being accompanied by a notice that plaintiffs would treat it as defendant's hay, and sell it on account if he did not take it.

On April 2d the defendant, having caused a car to be sent for his use, gave one of his balers a note to be delivered to the plaintiffs which was as follows:

"If you will deliver the straw today, I will allow you $6.50 per ton for it.

"D. T. UTLEY."

He instructed his agent to give the note to the plaintiffs, and that "if they refused to bring the hay for $6.50 to tell them that defendant would allow him $7 for it, and to say no more about it," and that he gave the agent no authority to make or accept any other proposal or arrange-

ment. Churchill, the agent, testified that he carried out these instructions, and that, after consultation, the father said to his son, "I guess, Ernie, we had better hook up and draw it," that he (Churchill) "got up to come away, and C. J. Lamb came and spoke something about that he wanted to retain title or something of that kind, and I asked him if he ever knew Utley to buy anything that he didn't pay for," and that he "did not understand that he said he would retain title or possession."

The plaintiffs did not dispute the foregoing testimony up to the point of the interview with Churchill. As to that, they admitted that to be the interview upon which they rested their claim of a new contract, taking the place of that of February 16th. They testified, further, in regard to it:

"After reading the note I told Mr. Churchill I would not accept $6.50 a ton for the hay. He then said that Mr. Utley told him that if he would not take $6.50 that he was to offer $7 a ton or would give him $7. I then told him 'that was the proposition I have been making to Utley right along, and I will do that, but,' says I, ' understand that I will reserve the title to this hay, possession of it, to be my hay until it is paid for.' Says I, ' I will load the car on my own account and when Utley pays me for the hay it will be his hay.' Mr. Churchill agreed to that. He said that Utley was a man that was well off, I believe. And he asked the question, did I ever know Utley to buy anything that he did not pay for, something like that. And he gave me to understand that Utley would pay me for the hay under the terms of the contract. I talked the matter over with my son and told him that I would load the car on my own account and Churchill was to work for me that day loading that car, and not for Utley, for I loaded it. He agreed to that. I hauled the hay to the car. I had no conversation with Utley so that he would understand what the bargain was. I had no conversation with Utley except incidentally as we were loading the hay.

" *Q.* Well, to refresh your recollection, did you make any or say anything as to the offer which you received from Utley ?

"*A.* I did.

" *Q.* And what did you do ?

"*A*. After we had agreed on the terms of the contract—

" *Mr. Brown:* I object to that as immaterial.

" *The Court:* Take it.    (Exception for defendant.)

"*A*. After we had agreed on the terms of the contract I turned the note over and wrote.   Made a memorandum agreement on the back of the note.   This was in the presence of Mr. Churchill.   I then read it to Mr. Churchill and he then agreed to it.

" *Q*. Do you know whether or not Mr. Churchill was acting as the agent of Mr. Utley at that time ?

"*A*. He was.

" *Q*. Have you heard Mr. Utely admit it since that time ?

" *A*. I have heard him say he sent him down there to do that business.   (Memorandum offered in evidence. Objected to as incompetent and immaterial.)

" *The Court:* It may be admitted.   (Exception for defendant.)

" Memorandum read:

"'Received the within of W. T. Churchill, 8 a. m. April 2nd. Churchill said that he was authorized by D. T. Utley to see if I would not accept the within offer at $6.50 per ton, Utley would pay $7. I refused $6.50, and then Churchill told me Utley would pay $7 per ton.   I accepted it at $7 per ton, I to load car on my own account, and turn it over to Utley on receipt from him of $7 per ton.

"'Witness: ERNEST LAMB.

" 'C. J. LAMB.'"

The controverted questions, both of law and fact, center in the interview with Churchill.

There is enough in the undisputed testimony to compel the conclusion that the arrangement made on April 2d was not intended by either party as a new contract by which the transaction of February 16th was to be abandoned.   It was nothing more nor less than an adjustment of their difference about the grading of the timothy, and to that extent a modification of the earlier contract. *McCombs* v. *McKennan*, 2 Watts & S. (Pa.) 218.   The only thing, in that connection, about which the parties disagree is the effect of the alleged talk about retaining possession of title.   There can be no doubt of the right of the parties to modify the original contract in that respect,

whatever opinion we may entertain of the effect of that contract upon the title or right of possession, and as the parties disagree regarding what transpired, it made a proper question for the jury, unless we should say, as a legal proposition, that it did not affect the original contract. We need not, however, discuss that question. The original contract, as modified by the reduction of the price of the timothy to $7, is the ground on which the defendant stands. If we concede his claim in that regard, we must say that, under that contract, the most that can be said is that he agreed to pay $7 a ton for that hay when delivered on board of cars, for delivery and payment were concurrent acts. In the absence of an express agreement, the law will imply a contract to pay cash upon delivery, and, in such a case, payment or tender is a condition precedent to the buyer's right of possession, and the seller is not bound to deliver until payment is made or tendered. See Benjamin on Sales (7th Am. Ed.), p. 299; 21 Am. & Eng. Enc. Law (1st Ed.), p. 563; *Robbins* v. *Harrison*, 31 Ala. 160; *Robinson* v. *Marney*, 5 Blackf. (Ind.) 329; *Hundley* v. *Buckner*, 6 Smedes & M. (Miss.) 70; *Goldsmith* v. *Bryant*, 26 Wis. 34; 24 Am. & Eng. Enc. Law (2d Ed.), p. 1095; *Clark* v. *Dales*, 20 Barb. (N. Y.) 61; *Empire State Type Founding Co.* v. *Grant*, 114 N. Y. 40.

If the seller delivers the goods and immediately demands payment, which is refused, he may retake the property. Benjamin on Sales (7th Am. Ed.), p. 299, and cases cited; *Richardson Drug Co.* v. *Teasdall*, 52 Neb. 698; *Wiggins* v. *Snow*, 89 Mich. 476. As the testimony shows that this was a cash sale, and there is nothing indicating a waiver of the right to withhold title and possession, until payment was made, it was the duty of the defendant to permit the plaintiffs to retain or retake the hay, unless he was willing to pay for it. Instead, he converted it to his own use, it being apparent that he received it or its proceeds. This gave plaintiffs the right of action for a wrongful conversion, and it is not correct to

say, as it is claimed that we should do, that the remedy must be confined to an action for breach of contract. *Wiggins* v. *Snow*, supra. As we are able to say that upon the face of the record the court might have properly directed a verdict for the plaintiffs, and no testimony offered by the defendant was improperly excluded, the errors alleged were without injury to the defendant.

The judgment is affirmed.

CARPENTER, C. J., and MONTGOMERY, OSTRANDER, and MOORE, JJ., concurred.